### MUNROE v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. July 9, 1914. Rehearing Denied August 11, 1914.)

#### No. 1047.

WITNESSES (§ 21*)—FAILURE TO COMPLY WITH SUBPŒNA DUCES TECUM—LIABILITY FOR CONTEMPT.

A witness is not subject to punishment for contempt for failing to produce, in obedience to a subpœna duces tecum, documents which were not in his physical possession nor under his personal control as of legal right, but were in a foreign country across seas, in the possession of a partnership of which he was a member, but not subject to his control except by consent of his copartners.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 37–41; Dec. Dig. § 21.*]

In Error to the District Court of the United States for the District of Massachusetts; Jas. M. Morton, Jr., Judge.

Proceeding for criminal contempt by the United States against Henry W. Munroe. Finding of guilty, and defendant brings error. Reversed.

For opinion below, see 210 Fed. 326.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Boyd B. Jones, of Boston, Mass. (Henry R. Stern, of New York City, on the brief), for plaintiff in error.

Asa P. French, U. S. Atty., of Boston, Mass., for the United States.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

PUTNAM, Circuit Judge. This is a writ of error to the District Court of the United States for the District of Massachusetts to review a judgment against Henry W. Munroe for contempt. The facts of the case are mainly stated for our purposes in the opinion of the District Court.

Munroe was found guilty of criminal contempt, and sentenced to pay a fine of $250 and be confined in jail for 10 days. The contempt charged was the alleged refusal or failure of Munroe to produce certain checks before the grand jury after service on him of a subpœna duces tecum. Munroe failed to produce the checks as ordered by the subpœna. Munroe is a citizen of the United States, residing, at the time of the service of the subpœna upon him, in the city of New York. He is the senior partner of the firm of Munroe & Co., whose principal place of business was, and is, in Paris, France, where the checks in question were, and always have been, and still are, and where the business transactions out of which the checks arose occurred; none of the transactions, so far as Mr. Munroe's partnership is concerned, having been in the United States.

There was no specific finding of facts; but this writ of error has proceeded before us on the opinion filed in the District Court as though it had been a formal finding of facts, the same having been incorporated in the record. It is necessary, therefore, with reference to certain requests for rulings, to refer to what appears in that record. The District Attorney had observed, as appears by the record, that he understood that certain requests were for facts, and not requests for rulings; and he said he was not quite clear whether the court refused to give them or declined to pass upon them as being immaterial. Thereupon the following came from the court:

"I regard them as immaterial, but I also refused them because the evidence produced before me did not sustain them."

Then Munroe excepted to the refusals of the court to find the facts as stated in certain other requests, some of which we will call to specific attention. Under the circumstances, we might reverse for the want of formal findings of fact, but we deem it suitable to proceed on the same line on which the parties have proceeded, namely, to hold the matters stated in the opinion of the District Court as facts found, and to pass upon the rulings made, and those requested and refused, in the light of what appears in the record before us. Proceeding thus, the facts found by the court covered the following:

"I find the material facts to be as follows: The defendant is a member of a partnership (Munroe & Co.) which consists of five partners and has been in existence at least 10 years. It is organized under the laws of France and is engaged in the business of banking and foreign exchange. The defendant has been a member of the firm since its organization, and is now the senior partner, and has the largest individual interest: he is a citizen of the United States. The principal place of business of the firm is in Paris, where three

of the partners are resident, of whom one is a French citizen, and another is a brother of the defendant. It has also had, for 10 years at least, a place of business in New York, in or near which city the defendant and one other partner reside. This place of business is carried on under the name of John Munroe & Co. Although the partnership is, as stated, organized under the French law, the rights of the partners inter sese do not appear, as to the papers and matters concerned in these proceedings, to be different from what they would be under the law of this district. At times the defendant went to Paris and participated in the business there, and one of the Paris partners came to New York and participated in the business there.

"In May, 1913, the United States officers had reason to believe that one Mary A. Dolan, of Brookline, Mass., might have been guilty of offences against the criminal laws of the United States by smuggling merchandise imported by her from Paris, France, into the district of Massachusetts, and her conduct in relation thereto was under investigation by the grand jury for this district at the times herein referred to. She had had a deposit with Munroe & Co. at its Paris establishment, against which she had drawn checks, which had been delivered to various persons in Paris in payment of accounts due them. These checks had been paid by Munroe & Co. at their Paris branch, and the paid checks were retained there. * * *

"On September 19, 1913, the defendant and the other New York partner of Munroe & Co. were duly served with a subpœna duces tecum of this court, commanding them to appear before the United States grand jury in Boston, and to produce certain papers and documents therein specified, among which were certain paid checks drawn by Mary A. Dolan upon Munroe & Co. at their Paris house. Other papers were called for by the subpœna, the production of which is not now insisted upon, and as to which the defendant was informed by the United States officers that they need not be produced. A correct copy of said subpœna and returns of service thereon is annexed to the presentment of the grand jury for contempt. No question has at any time been raised by the defendant that the subpœna required the production of an unreasonable number of documents, or insufficiently described the documents which were required. The checks called for by it were material and important evidence upon the matters which the grand jury were investigating. At the time of the service of this subpœna, said checks were, and they still are, in Paris, in the possession of the firm of Munroe & Co., of which the defendant, as has been stated, was and is a member. In other words, the possession of the checks was in the defendant and his four partners as joint tenants.

"This subpœna the defendant, under advice of counsel, entirely disregarded in so far as it required the production of papers or documents. He did not communicate to his partners in Paris the fact that the subpœna had been served upon him. He made no request upon the Paris house to forward the papers called for by it, and made no effort whatever to obtain any of the papers specified in it. He appeared before the grand jury October 22d and testified that he had not the papers called for, that he had made no effort whatever to obtain them since the service of the subpœna, and that he was under no obligation to make any effort to obtain said papers or checks. The other New York partner was excused from appearing before the grand jury, and no proceedings are pending against him.

"Thereupon the defendant was presented by the grand jury for contempt, and these proceedings were instituted. The statements of fact in the presentment of the grand jury are true.

"A hearing was had before me upon said presentment on October 29th, at which the defendant was present with counsel, and such evidence was taken as either party desired to offer. At said hearing the facts appeared to be as above stated, and at the conclusion of the hearing I said:

"'I think, when the government required evidence for use in prosecutions, that as a citizen of the country he was bound to make a reasonable and honest and diligent effort, not to pass into unreasonable bounds (and plainly to procure a few checks was nothing unreasonable to ask of a man) to get the evidence requested when he was a joint owner of it. I do not think it is par-

ticularly important that the papers in this case are in Paris. They might be in Chicago; they might be in San Francisco. The fact is that a joint owner of documents called for by a subpœna duces tecum, without making any effort whatever to procure them, comes into court and says, "I am not bound to make any effort." I think he is. I haven't any doubt that upon the facts here the defendant is in contempt.'"

Other matters appearing in the opinion of the District Court are not essential to the case presented here. They were connected with a praiseworthy attempt on the part of the court to adjust the matter amicably. In the eyes of the law they are only personal matters, and cannot affect this writ of error.

Various errors were assigned that were too general according to technical rules. The grounds upon which we rest our conclusion, however, are of so fundamental a character that we have a right to refuse to be committed to any result contrary thereto; and they may be said to be covered by the general assignments of error to which we refer, and also by the following assigned error:

"3. Said District Court erred in refusing to make the sixth ruling requested by the defendant, namely:

"'The evidence does not warrant a finding that at or since the date of the service of the subpœna upon the defendant the checks or drafts therein referred to were not in Paris, France, in the actual possession of the partners of the defendant under a partnership agreement whereby such partners were under no obligation to send the same to the defendant at New York, and whereby the defendant had no right, without the consent of all the partners, to have the checks sent to him at New York.'"

As to this refusal the request was correct, because, the right being a joint right, and the papers referred to, as well as the partners referred to, being in a foreign country, where the business to which the papers related was transacted, it was plain that the partners who resided there, and had the papers in their possession had the privilege of objecting to their being forwarded to a foreign country if they desired so to do. This is plain law, as was stated by Vice Chancellor Shadwell in The Attorney General v. Wilson, 9 Simons, pages 526 and 530. It may be added that this proposition is so clear that there is no necessity of citing any authorities in reference thereto. It is true that the court observed that if Munroe had been insistent upon a request for the papers they would have been forwarded to this country; but there is no evidence to that effect. We know of no proofs upon that point except of a mixed character; indeed, so far as that is concerned, the case is exactly like The Attorney General v. Wilson, supra, except that in The Attorney General v. Wilson the party proceeded against made a statement that his copartners would not give their consent to the delivery of the books, papers, etc., asked for by the subpœna. In neither case was there any direct evidence that such a consent had been in fact refused.

Two other errors assigned were as follows:

"(8) Said District Court erred in ruling that the question of whether the defendant was of right entitled to have said checks or drafts sent to him at New York by his partners for the purposes of said subpœna was immaterial.

"(9) Said District Court erred in refusing to make the eleventh ruling requested by the defendant, namely:

" 'If the defendant at the date of the service of said subpœna was not, and has not since been, entitled as of right to have said checks or drafts sent to him at New York for the purposes of said subpœna, then he cannot be found guilty of criminal contempt for not having obtained them, even if the court should find that his partners by way of favor would have sent them to him at New York if he had requested it.' "

In proceeding on a matter of contempt, involving a fine and imprisonment, Munroe was entitled to have his rights positively determined, and there should have been a positive ruling of the court upon these propositions; and that ruling would necessarily have been against the United States, and would have positively precluded any proceeding against Munroe growing out of the answer thus given. In the line of the request per the above alleged errors 8 and 9, was also the following leading up to them, although it was practically covered by what we have from the opinion of the learned judge of the District Court:

"(13) The District Court erred in refusing to make, without any qualification, the findings of fact asked for in the defendant's first request for finding, namely:

" 'At the time of the service of the subpœna referred to in the above-entitled petition the defendant was in New York City, and the checks therein set forth were not in the physical possession of the defendant, but were in Paris, France, in the possession of the banking copartnership of Munroe & Co., of which the defendant was then a partner.' "

No observation, however, is required with reference to assigned error 13; it only leads up to assigned errors 8 and 9, and the whole together would have necessarily resulted that the court could not compel Munroe to do what he could not do in his own right, nor punish him for contempt in neglect in reference thereto. The fundamental question involved is not one of morals or etiquette, nor one whether the court could punish Munroe for not doing what he could accomplish only with the aid of favors from other persons; it could only punish him for what was in his power or legal right to do, and this, too, leads directly to what is the leading case on this topic.

We refer to the opinion of Lord Ellenborough, in Amey v. Long, 9 East, 473, relating to subpœna duces tecum, announced in 1808, and of the highest authority in reference thereto. He was speaking the unanimous opinion of the Court of King's Bench. Some things have since been broadened out in practice, but there is nothing to show that what we now quote from this opinion, at pages 482 and 483, has ever been modified in practice or questioned in theory, namely:

"As to the first of these objections, and which applies to both counts of the declaration equally, it appears to us that the allegation 'that the defendant could and might in obedience to the said subpœna have produced and shown forth at the time and place aforesaid, at the said trial of the said issue, the said warrant mentioned and referred to in the writ of subpœna,' in the plain, natural, and obvious sense of these words, imports an immediate physical ability to do the thing required to be done on the part of the defendant; i. e., that the defendant was able, by having the warrant in his own possession, to have produced it, and not that, by application to others who had the custody of it, he could and might have acquired the means, and indirectly have become the instrument, of producing it. The latter sense of the words is indeed so remote from the ordinary understanding of mankind on such a subject, and has so little reference to the duty sought to be enforced, viz., the production of that by the witness which the witness could, in obedi-

ence to the subpœna, personally produce, that, after verdict, it is not to be intended that the judge at the trial received proof of the words in this strained and unnatural sense of them. And when it is afterwards said in the count that the defendant did not, nor would, at the time and place of trial, produce the warrant, although solemnly called upon by the court for that purpose, 'and, although he had no lawful or reasonable excuse or impediment to the contrary,' it certainly excludes the case of the warrant being in the possession of another, and on that account attainable only through the means or by the delivery of such other person, inasmuch as the existence of such circumstances, if they had in fact existed, would have afforded 'a lawful and reasonable excuse and impediment to the contrary,' and of course have falsified the allegation upon which the blame of nonproduction is rested; no man being obliged, according to any sense of the effect of such a subpœna, to sue and labor in order to obtain the possession of any instrument from another for the purpose of its production afterwards by himself, in obedience to the subpœna."

We lay emphasis here upon the words, "could and might have produced," "imports an immediate physical ability to do a thing required," "by having the warrant in his own possession," "and not that by application to others who had the custody of it," "which the witness could, in obedience to the subpœna, personally produce," "excludes the case of the warrant being in the possession of another," "and no man being obliged to sue and labor," etc. Of course, this is not to be taken too literally, but it certainly applies to the case of this plaintiff in error. He could not lawfully be called upon under a writ of subpœna duces tecum, to sue and labor to the extent of superintending shipment of papers from France to the United States, to have the care and responsibility of them upon arrival, or of being obliged to await the necessities of Atlantic navigation, and to assume all the other incidents of an importation of this character, including the chance of the time of the arrival of the documents and the travel to and from in connection therewith, merely for the per diem of a witness of perhaps only one day attending court, and the mileage from his place of residence to the place of trial.

We make these observations because the amount of responsibility and attention required from the position of the United States, with reference to importing documents from a foreign country, are too great to be lawfully demanded as the result of a subpœna duces tecum upon an ordinary witness; and in doing this we stop short of considering whether, in any event, the service of a subpœna can compel a witness to go outside of the district of his own residence for the purpose of obtaining documents, or for any purpose except traveling to the place of judicial session for which he is compensated, and especially whether a subpœna duces tecum can compel the holder of documents, which, in many cases, may be of very great value, to transport them from one foreign country to a domestic country, and especially across the high seas, with all the perils attaching thereto. No case can be found which justifies a proposition of that character. The caution which the common law took in regard to transportation of documents of value across the high seas is illustrated by what is said in Bacon's Abridgement under Error (D) II. While, with reference to a writ of error from Parliament to the King's Bench, the Chief Justice was required to attend with the original record, though the same was immediately restored

to the King's Bench, yet, on a writ of error to a judgment in the King's Bench in Ireland, only a transcript of the record was sent across the channel by reason of the dangers of the seas. This practice was commented on by Lord Mansfield in Vicars v. Haydon, Cowper, 841 and 843.

The judgment of the District Court is reversed, and the case is remanded to that court for further proceedings in accordance with law